FILED
02/07/2017
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 4, 2017

## IN RE: COLTON R.

**Appeal from the Circuit Court for Blount County**
**No. E25607   Tammy M. Harrington, Judge**

_____

**No. E2016-00807-COA-R3-PT**

_____

This is a termination of parental rights case.  Mother and Stepfather filed a petition to terminate the parental rights of Father to the child.  The trial court found that the grounds of (1) abandonment for willful failure to visit as defined by Tennessee Code Annotated section 36-1-102(1)(A)(i), (2) abandonment for willful failure to visit by an incarcerated parent as defined by Tennessee Code Annotated section 36-1-102(1)(A)(iv), and (3) abandonment based on conduct demonstrating a wanton disregard for the welfare of the child had been proven by clear and convincing evidence.  The trial court also found that termination was in the best interest of the child.  Father appeals.  We reverse the trial court's finding of abandonment by willful failure to visit as defined by Tennessee Code Annotated section 36-1-102(1)(A)(i) but affirm the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part; and Affirmed in Part.**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Nicholas Black, Maryville, Tennessee, for the appellant, Mark R.

David K. Calfee, Cleveland, Tennessee, for the appellees, Cheryl W. and Michael W.

**OPINION**

## I. BACKGROUND

Colton R. ("the child") was born in February 2005, to Petitioner/Appellee Cheryl W. ("Mother") and Respondent/Appellant Mark R. ("Father").[1] Father and Mother were married on February 14, 2002, and divorced by order of the Bradley County Circuit Court ("divorce court") on August 12, 2011. The divorce court adopted and approved the permanent parenting plan previously executed by the parties, which provided for equal co-parenting time with the child and designated mother as the primary residential parent. It is undisputed that no court ever ordered child support to be paid by either parent.

On April 4, 2012, Father was arrested in Bradley County and charged with two counts of theft over $1,000.00. Father was released from jail on bond the same day. This incident was only the first in a series of criminal charges against Father, as discussed in detail, *infra*. On the same day, the divorce court, entered an ex parte order for emergency custody granting Mother exclusive custody of the child. On or about June 1, 2012, the divorce court entered an order allowing Father supervised visitation, with one visit to occur mid-week lasting two hours and a second visit on the weekend lasting four hours. The divorce court further ordered that Father be allowed to call the child every day at 5:30 p.m. for fifteen to thirty minutes depending on the child's desire to talk. At the June 1, 2012 hearing, the divorce court also revealed the contents of its in-chambers interview with the child during the course of the hearing. The child was seven years old at the time.[2] According to the divorce court, the child revealed that Father "stole something" and that Father told the child "Son, you can't tell anybody about this."

In the span of approximately nine months, Father was charged with eight additional crimes related to theft of property, ranging from misdemeanor theft to charges as serious as theft over $10,000.00 and burglary. At least two of the charges were dismissed and one was reduced to a lesser offense. However, Father pleaded guilty to eight crimes, including the two initial theft charges in Bradley County, discussed *supra*, and two charges of theft over $10,000.00. By our review, Father appears to have been ordered to spend eleven months twenty-nine days in jail but was allowed to serve the remainder of his three-year sentence on community corrections. Father's jail sentence was reduced by pre-trial credits, and he was ultimately released from jail into community corrections on November 22, 2013.[3] Meanwhile, Mother and Petitioner/Appellee Michael W. ("Stepfather," or, together with Mother, "Appellees") married on August 3, 2012.

---

[1] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] Counsel for both Father and Mother were present during the in-chambers interview.

[3] As discussed, *infra*, Father contests one of his felony convictions. Pursuant to an order entered on or about September 9, 2015, the Polk County Criminal Court found that Father's claims "raise a colorable claim for review" concerning the Bradley County and McMinn County convictions from 2013.

As discussed, *infra*, Father resumed contact with the child through some telephone calls and two supervised visitations at a supervision center in Madisonville ("supervision center") sometime in January 2014. Father's legal troubles, however, were not over. On February 19, 2014, a warrant was issued for Father's arrest for violation of community corrections based on charges in Polk County of burglary other than a habitation and theft over $1,000.00. The Polk County criminal charges were eventually dismissed against Father on August 20, 2014, but Father was indicted on the same charges sometime afterward.[4] No visitation occurred while Father evaded arrest. Father remained a fugitive for approximately ninety days until he was apprehended on May 13, 2014. Thereafter, Father admitted that he had violated the terms of his community corrections sentence and, in January 2015, agreed to revocation of his community corrections sentence. Father was therefore ordered to serve the remainder of his prior five-year sentence in jail. There is no dispute that Father has remained continuously incarcerated from May 13, 2014, until the date of the final hearing.

On May 27, 2014, Mother and Stepfather filed a petition in the Blount County Circuit Court ("trial court") to terminate the parental rights of Father and to permit adoption of the child by Stepfather. An amended petition was filed on December 21, 2015, containing the same grounds for termination as the original petition.[5] Therein, the petition alleged as grounds for termination: (1) abandonment by willfully failing to visit and/or support; (2) abandonment by willfully failing to visit by an incarcerated parent; and (3) abandonment based on conduct that exhibited a wanton disregard for the welfare of the child. By order of July 28, 2014, the trial court found Father to be indigent and appointed counsel for Father and a guardian ad litem for the child. After several continuances and appointment of new counsel for Father, a final hearing was held on February 18, 2016.

At trial, Mother testified that she agreed to equal parenting time at the time of her divorce from Father because Father and the child had a very good relationship, noting that Father coached the child in sports at the time. However, Mother testified that issues with Father began even before the divorce was final and got worse prior to the finalization of the divorce. According to Mother, Father was very angry, would curse at her in front of the child, and would call her names whenever Mother and Father talked on the phone. On cross-examination, Mother admitted that issues with Father were partially attributable to her infidelity. Mother testified she arranged for the child to be seen by a

---

[4] As of the date of the final hearing on the termination petition, Father was still awaiting trial on the charges.

[5] On November 20, 2015, Father filed a motion to dismiss for Appellees' failure to comply with the notice requirements of section 36-1-113(d)(4) of Tennessee Code Annotated. After a hearing on November 20, 2015, by order of January 4, 2016, the trial court granted Appellees leave to file an amended petition "to cure any technical defect which might exist."

counselor per the order of the divorce court. According to Mother, the child was discharged by the counselor in May 2012.

Mother testified that, on April 4, 2012, the date of Father's initial arrest, she was informed that Father had been arrested. As a result, Mother testified that she checked the child out of school early presumably to prevent Father from picking him up. Even though she was aware that Father had been released on bond, Mother testified that she, with the counselor's help, informed the child that Father was in jail. On the same day as Father's initial arrest, Mother testified that she filed a successful petition for an ex parte order of emergency custody. As a result, Mother testified that Father had no contact with the child from the day the ex parte order of custody was issued until the June 1, 2012 hearing. After the June 1, 2012 hearing, Mother testified that the parties agreed Maternal Grandmother would supervise Father's visits with the child. According to Mother, Maternal Grandmother supervised approximately three visits before Father's re-arrest in January 2013. Mother admitted that it was not her main priority to arrange for Father's court-ordered visitation. Mother testified that she preferred for Father to have phone contact with the child rather than in-person visitation because she was concerned for the child's well-being in Father's presence even with supervision. According to Mother, she would allow Father to speak with the child for his court-ordered phone calls only if the child desired to speak to Father.

From the summer of 2012 to January 2013, Mother claimed that Father saw the child three times—once at a park in Madisonville, once during supervised visitation with Maternal Grandmother around Christmas, and another time at the Zuma Fun Center in Knoxville. When Maternal Grandmother chose to discontinue supervision, Mother testified that the parties never returned to court to find another supervisor. Mother testified that she, herself, was not willing to supervise the visits.

After Father was released on community corrections in November 2013, Mother recalled that he very soon thereafter made contact with the child because Mother did not take the child to visit Father in the jail. Mother admitted that it took some time for the visits to start and that she had suggested the supervision center as the only avenue that Father could exercise his visitation with the child; Mother stated that she expected him to get that established and paid for before he could see the child. Mother explained that the application fee at her preferred supervision center was not unreasonable because it cost only $5.00 or a donation of two to three canned items. Mother recalled that Father saw the child two times at the supervision center, each for two-and-a-half hours long. Mother testified that the parties arranged for a standing appointment every Wednesday at the supervision center but Father did not participate after the two visits. According to Mother, although additional visits were scheduled at the supervision center, some visits were cancelled because of weather conditions and Father's failure to attend due to a job orientation. Although Mother preferred for the child not to see Father, she claimed that if the child wanted to see Father, she would have made it happen.

- 4 -

According to Mother, once she was notified that a warrant was issued for Father's arrest, she stopped allowing visitation and phone calls. Mother admitted Father tried to call "once or twice maybe" while he was evading arrest but that she did not allow him to speak with the child. Mother testified that Father's side of the family is welcome to contact the child and can reach her through Facebook; however, they likewise had not made contact with the child in over a year.

Although Father did not provide any support for the child from the time he was restricted to supervised visitation, Mother recalled that Father did give the child gifts and clothes over the years.

Mother testified that she had been married to Stepfather for four years, whom she started dating before the divorce was finalized. Mother described their relationship as "fabulous," and testified that the child is doing "wonderful" in school. According to Mother, the child is a straight-A student, participates in advanced classes, and excels in standardized tests. Mother denied that the child was having any issues, educationally or athletically, during the course of the litigation or as a result of Father's incarceration. Mother testified that the child plays football, baseball, and basketball, and that Stepfather had coached the child's football team since the child was seven years old. According to Mother, Stepfather is very involved with the child, attending all of his baseball and basketball games and volunteering to help when needed. Mother testified that, besides the child, two other children live in the home with her and Stepfather: Stepfather's son from a previous marriage ("Stepbrother") and a female child in their custody ("Sister").[6] Mother testified that no significant issues exist with regard to the children's relationship among themselves. Because Stepfather has no rights to the child, Mother testified that the schools would not communicate with him. Prior to marrying Stepfather, Mother conceded that there was some litigation about Stepfather's overnight visits. Although there was an allegation that the child saw Mother and Stepfather engaged in sexual activity, Mother denied that the child ever witnessed such an activity.

Mother denied filing the termination petition out of a vindictive motive and testified that she would not have filed the petition had Father not engaged in criminal activity. According to Mother, she discussed Father's situation with the child whenever the child asked questions because the child was aware that Father was in jail. Mother recalled that the child sent Father a few postcards.

Mother testified that, although the child's last name is legally the same as Father's, the school allowed the child to use the last name of Stepfather informally at school but

---

[6] Although the record is not clear as to who this other child is, Appellees' appellate brief reveals that Sister is "the [Appellees'] niece (who is in their custody by virtue of an order from the McMinn County Juvenile Court)."

not on any legal testing that may occur. Mother further testified that she did not discourage child from using Stepfather's last name.

Stepfather testified about his work schedule and how he met Mother, including the allegations of infidelity in the divorce. According to Stepfather, his relationship with the child is "great." Stepfather testified that he started to actively spend time with the child sometime after the divorce. Stepfather takes the child hunting and fishing. In addition, Stepfather coached the child for four years in football as of the date of trial and helped the coaches with the child's baseball team. When asked about his parenting responsibilities, Stepfather testified that the child spends a lot of time with him during the sports season, with Mother present, and Mother takes the child to school and picks him up.

Stepfather testified that he has a twenty-four-year-old daughter whom he sees during the holidays, as well as Stepbrother, who resides in Mother's and Stepfather's home every weekend. Stepfather denied allegations of domestic violence against his ex-wife; according to Stepfather, his ex-wife filed an order of protection subsequent to the allegation but that the order was dismissed by agreement.

Stepfather denied being present when Mother discussed Father's criminal issues with the child. Stepfather testified that the child wanted to use his last name because he "[did not] want to be associated with [Father's] name, a criminal." According to Stepfather, when the child asked for permission to use Stepfather's last name at school, Stepfather gave his permission subject to the school's approval. Stepfather further testified to the child's refusal to visit with Father. Stepfather denied witnessing any inappropriate behavior between Father and the child. Stepfather testified that the child is very resilient and that he is very bright and in control of his emotions for his age. When Stepfather was asked whether he understood the ramifications of the child's adoption, Stepfather testified that he understood and that he was committed one hundred percent.

Father testified next and stated that, from the moment the child was born, he and the child were "very close." According to Father, Mother returned to work six weeks after the child was born, working nights at a hospital. Father further testified that he worked during the day and took care of the child at night because Mother did not switch to a day shift until the child was about four or five years old.

Father denied being evicted from his apartment, but a certified copy of a detainer warrant was introduced evidencing the eviction. Father explained that, because he was in custody from June 13, 2012 through July 13, 2012, he was unable to pay rent. Father admitted that he did not have a stable residence after he was released on bond on July 13, 2012. As of the date of the hearing, Father was unsure of when he was going to be released from custody.

Father testified that on April 4, 2012, the date of his first arrest, he took the child to school. According to Father, it was his day to visit, as well as his day to pick the child up from school. Father testified that he was in custody from approximately 9:00 a.m. to 10:00 a.m. and called Mother immediately when he got out of jail. Father testified, however, that Mother had already checked the child out of school. Father testified that he pleaded with Mother to let him see the child but that she refused. According to Father, he tried to call the child every day, but that if he was one minute off from the 5:30 p.m. time, Mother would not allow the child to talk to him. Father also testified that he tried to send text messages to the child but that return messages told him to stop texting because the child would not receive the messages.

Father testified that he was able to visit with the child on December 27, 2012, at a bowling alley with Maternal Grandmother supervising. According to Father, he gave the child presents worth a total of $500.00 at this time. After the child went home with Maternal Grandmother, Father testified that he went to Maternal Grandmother's house the next day and spent time with the child before Mother picked him up. The next visit that Father could recall was at the supervision center, sometime after his release on community corrections. Father explained that the supervision center only allowed him to visit on Wednesdays and that Mother refused to make arrangements for Father to be able to visit with the child on the weekends.

According to Father, after he was released on November 22, 2013, he called the child every day at 5:30 p.m. and had a phone relationship with the child. In the meantime, Father testified that, despite his attempts to set up visits, Mother would not provide a reason why Maternal Grandmother could not continue supervising the visits and rejected every supervisor that he suggested, making him "jump through hoops." Father testified that he called several agencies before he found one that Mother would accept; visitation then resumed in January 2014.

Father recalled having two visits at the supervision center. According to Father, a few visits were cancelled because of the weather, he cancelled one visit for a job interview, and Mother cancelled another visit with no explanation. The last visit Father could remember occurred on February 6, 2014. Although Father testified that he was not aware if another visit was scheduled after Mother's latest cancellation, Father admitted that he did not request visitation at the supervision center after the last visit. Father also admitted that he was "on the run" for about ninety days after a warrant was issued for his arrest on February 19, 2014. Father testified that he did not wish for the child to witness the police arresting him. Father admitted that all of the criminal behavior that he participated in had been a "personal choice" and that he had "made some bad decisions."

After his release on community corrections, Father testified that he started looking for work immediately. According to Father, he worked "a little here and there" for his dad, who worked for some brick and block masons. Father testified that it was difficult

to find a job due to a disability caused by a prior car accident and his criminal record. According to Father, initially, he was set to be released from custody as a result of his May 13, 2014 arrest because the basis for his community corrections violation, the Polk County charge, had been dismissed. However, Father testified that community corrections filed an addendum to its violation report, alleging that Father failed to report in February 2014 in violation of his community corrections terms. Father explained that he failed to report because he was attempting "to obtain an attorney before [he] returned to jail and turned [him]self in." Nevertheless, Father stipulated that he had materially violated the terms of community corrections by failing to report in February 2014 and began his Tennessee Department of Corrections sentence. Even with the pending warrant, Father testified that he attempted to call the child on "numerous occasions" until his arrest on May 13, 2014.

According to Father, although the judgments reflect that he pleaded guilty to the McMinn County criminal charge, he contended that he never pleaded guilty and is therefore contesting his guilt. Father testified that one of his felony convictions was actually dismissed during a preliminary hearing; thus, this conviction is the subject of his pending writ of error coram nobis along with his belief that that he had been in jail for ten months too long. As a result, Father sought to be released from his current custody. Father testified that he had not had any disciplinary issues while he was in jail. Father stated his intention to return to work immediately should he be released, stating that he had previously owned his own business making custom kitchen cabinets and fireplace mantles.

When asked about the allegation that the child accompanied Father on one of his criminal ventures, Father contended that the child's characterization of the event as criminal was incorrect. At the time, the child was six years old. Father explained that he made kitchen cabinets and did "foreclosure work for bank owners and investors." On that particular day, Father asserted that he took the child to a job at a foreclosed home. Although the windows and house were boarded up, Father claimed that he had "sole rights" to anything he wanted in the house. Father claimed he used a crowbar to gain access into the house because it was his only way to get in. Father denied ever introducing the child to any illegal activity. Although Father admitted taking items from the house, Father testified that no criminal charges resulted from this incident.

The child, ten years old at the date of the final hearing,[7] testified in chambers with counsel for both attorneys and the guardian ad litem present. The child testified that, although that he had not seen Father frequently over the past few years, the visits that did occur were "[g]ood." According to the child, the visits became supervised "because if nobody was there, he might take me and never bring me back." The child explained that his understanding was based on personal experience, stating that Father had done this in

---

[7] The date of the final hearing was one day before the child's eleventh birthday.

the past. When asked about Father's criminal charges, the child recalled being present prior to the initiation of the supervised visitations when Father stole a vacuum cleaner and "something else" that he could not remember from a house. The child recalled that Father used a crowbar and knocked down the door. The child stated that he did not want to see Father again even if Father got out of jail the following week; however, he would not be opposed to speaking with Father on the phone. The child testified that Mother probably would not allow him to visit Father in jail but would outside of jail. According to the child, because he saw Father steal, his opinion would not change even if the jury found Father not guilty. The child further testified that he still loves Father but that he was somewhat angry at Father for making bad decisions.

The child stated that he asked to have his last name changed to Stepfather's and that no one pressured him into this request. The child testified that he did not want to be associated with a criminal father. The child indicated that he wished for Stepfather to be his dad because his relationship with Stepfather was "strong" and that they spend considerable time together. In fact, the child testified that he wanted to be a physician's assistant just like Stepfather. The child described Stepfather as a good father and testified that, besides being involved in sports, Stepfather also took him hunting, fishing, and riding four-wheelers.

At the conclusion of the trial, the trial court issued an oral ruling. Thereafter, the trial court entered an order on March 21, 2016, an amended version of which was entered on August 8, 2016.[8] The trial court found that the ground of abandonment based on willful failure to support was not proven by clear and convincing evidence. However, the trial court found that Appellees had proven by clear and convincing evidence that grounds for termination of Father's parental rights existed based on (1) abandonment by willful failure to visit pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i), (2) abandonment by willful failure to visit by an incarcerated parent pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv), and (3) abandonment by engaging in conduct prior to incarceration that exhibited a wanton disregard pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv). The trial court further found that termination of parental rights was in the best interest of the child. Father timely appealed.

---

[8] By order of July 19, 2016, this Court concluded that the March 21, 2016 order was not a final order because it neither "disposed of the petition insofar as the prayer for an adoption was concerned" nor complied with Rule 54.02 of the Tennessee Rules of Civil Procedure. *See* Tenn. R. Civ. Pro. 54.02 (allowing the trial court to "direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment"). Thereafter, the trial court entered an amended order on August 8, 2016, directing the entry of a final judgment in compliance with Rule 54.02.

## II. ISSUES

Father raises three issues for our review, which we have slightly restated as follows:

1. Whether clear and convincing evidence supports the trial court's ruling that grounds existed for termination of Father's parental rights to [the child] due to his abandonment (willful failure to visit) pursuant to Tenn. Code. Ann. §36-1-113(g)(1) and 36-1-102(1)(A)(i) & (iv).
2. Whether clear and convincing evidence supports the trial court's ruling that grounds existed for termination of Father's parental rights to the child due to his abandonment (wanton disregard) pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and 36-1-102(a)(A)(iv).
3. Whether clear and convincing evidence supports the trial court's ruling that termination of Father's parental rights to the child was in the child's best interests pursuant to Tenn. Code Ann. § 36-1-113(i).

## III. STANDARD OF REVIEW

As recently explained by the Tennessee Supreme Court:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29,

2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653. As the Tennessee Supreme Court has stated:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d [387,] 393 [(Tenn. Ct. App. 2009)] (quoting *In re Adoption of A.M.H.*, 215 S.W.3d [793], 810 [(Tenn. 2007)]). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*Carrington H.*, 2016 WL 819593, at \*12.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

## IV. DISCUSSION

### A. Grounds for Termination

Pursuant to Tennessee Code Annotated section 36-1-113(g)(1), "[a]bandonment by the parent or guardian" constitutes a ground for termination of a parent's parental rights. Tennessee Code Annotated section 36-1-102, in turn, provides several definitions

for abandonment. In this case, Appellees alleged, and the trial court found, the following types of abandonment against Father: (1) abandonment for willful failure to visit prior to the filing of the termination petition under Tennessee Code Annotated section 36-1-102(1)(A)(i); (2) abandonment by an incarcerated parent for willful failure to visit under Tennessee Code Annotated section 36-1-102(1)(A)(iv), and (3) abandonment by an incarcerated parent for wanton disregard under Tennessee Code Annotated section 36-1-102(1)(A)(iv).

### *1. Abandonment by Willful Failure to Visit*

We begin with abandonment by willful failure to visit pursuant to Tennessee Code Annotated sections 36-1-102(1)(A)(i) and (iv), both of which were alleged in the termination petition and found by the trial court. The first definition provides a ground for termination where "[f]or a period of four . . . consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . the parent . . . ha[s] willfully failed to visit . . . the child[.]" Tenn. Code Ann. § 36-1-102(1)(A)(i). In contrast, the latter definition provides a ground for termination where "[a] parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit . . . for four (4) consecutive months immediately preceding such parent's or guardian's incarceration[.]" Tenn. Code Ann. § 36-1-102(1)(A)(iv). Either ground may be proven by establishing "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Tennessee Code Annotated section 36-1-102 further provides that "token visitation" means that "the visitation . . . constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

As is evident from the above language, there are two substantive differences between the definitions of abandonment by failure to visit. First, in order for subsection (iv) to apply, the parent must be incarcerated at the time of the filing of the termination petition or in the four months preceding the filing of the termination of parental rights petition. *See **In re Keith W.***, No. W2016-00072-COA-R3-PT, 2016 WL 4147011, at \*6 (Tenn. Ct. App. Aug. 3, 2016) (holding that the incarcerated parent definitions for abandonment did not apply because the father was not incarcerated at or in the four months preceding the filing of the termination petition); *see **In re Navada N.***, No. M2015-01400-COA-R3-PT, 2016 WL 3090908, at \*14 (Tenn. Ct. App. May 23, 2016) (describing incarceration within the four months preceding the filing of the termination petition as a "condition precedent" to the application of the abandonment definitions under Section 102(1)(A)(iv)); ***In re Audrey S.***, 182 S.W.3d 838, 870 (Tenn. Ct. App. 2005) (noting that subsection (iv) first describes "the class of people to whom the statute

applies," i.e., those parents who were incarcerated on or in the four months preceding the filing of the termination petition). If that condition precedent is met, abandonment by willful failure to visit under subsection (iv) requires the court to consider the four months preceding incarceration, rather than the four months preceding the filing of the termination petition that would be applicable under subsection (i) if the condition precedent was not met. Thus, the two alternative definitions concern different time periods.

This Court observed that the purpose of the willful failure to visit by an incarcerated parent ground for termination is to prevent a parent from using his or her incarceration as "a ready-made excuse for his or her failure to visit or support the child during the four-month period made relevant by the first statutory definition of abandonment." *In re Audrey S.,* 182 S.W.3d at 865. As such, this Court has explained that typically, "if a parent has been incarcerated during this four month time period, then the definition of "abandonment" found in Tenn. Code Ann. § 36-1-113(1)(A)(iv) will apply[.]" *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at \*4 (Tenn. Ct. App. Apr. 25, 2005). In *In re Audrey S.*, for example, the parent whose rights were at issue had been incarcerated for the "entire four-month period preceding the filing of the . . . termination petition" and the children's custodial parents refused to allow visitation at the prison. *In re Audrey S.,* 182 S.W.3d at 864. Accordingly, the Court of Appeals ruled that the parent's failure to visit during the relevant four-month period was not willful. *Id.*

Although not specifically argued by Father in his appellate brief, our research reveals that this Court has repeatedly held that the definition of abandonment found in subsection (i) is inapplicable where the parent has been incarcerated during all or part of the four months preceding the filing of the termination petition. *See In re Karma S.C.*, No. E2013-02198-COA-R3-PT, 2014 WL 879155 (Tenn. Ct. App. Mar. 5, 2014); *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618 (Tenn. Ct. App. Apr. 29, 2005). For example, in *In re W.B., IV*, the petition alleged that the child's father abandoned him by failing to visit in the four months preceding the filing of the termination petition under subsection (i). The trial court agreed and terminated the father's parental rights on this ground, among others. *In re W.B., IV*, 2005 WL 1021618, at \*10. The Court of Appeals reversed, however, concluding that because the father was incarcerated during part of the four months preceding the filing of the termination petition, the ground contained in subsection (i) "could not be applied to [the] [f]ather." *Id.*; *see also In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005) ("Because the [m]other was incarcerated for a portion of the four months immediately preceding DCS's institution of this termination action, the statutory definition of abandonment contained in section 36-1-102(1)(A)(iv) applied to this proceeding."). Rather, this Court held that subsection (i) "was simply not applicable, as a matter of law" due to the fact that the father had been incarcerated during part of the four months preceding the filing of the termination petition. *In re W.B.*, 2005 WL 1021618, at \*11. Similarly, in *In re Karma*

*S.C.*, the mother argued that the trial court erred in terminating her parental rights pursuant to the subsection (i) definition of abandonment because "she was incarcerated at some point during the four-month period preceding the filing of the [p]etition." *In re Karma S.C.*, 2014 WL 879155, at \*4. The Court of Appeals agreed that if the mother was incarcerated during any portion of the four months preceding the filing of the termination petition, "the court, in considering abandonment, **must** look to the parent's visitation and support during the four[-]month period preceding incarceration rather than to the four-month period preceding the petition." *Id.* at \*5 (emphasis added). Consequently, in this case, if Father was incarcerated at the time of the filing of the termination petition, or for any part of the four months preceding the filing of the termination petition, the trial court erred in terminating Father's parental rights pursuant to the definition of abandonment found in section 36-1-102(1)(A)(i). We, therefore, proceed to consider whether Father was incarcerated during this period, the time between January 27, 2014, and May 26, 2014, the date immediately before the date of the filing of the termination petition.

Here, it is undisputed that Father was incarcerated on May 13, 2014, and was continuously incarcerated thereafter even at the time of the filing of the termination petition on May 27, 2014. However, Father argues that, because the Polk County charges were still pending at the time of the final hearing, he "should have been afforded his constitutionally protected presumption of innocence on that charge, and his incarceration at the time of the filing of the [p]etition should not have been found to be willful." As we perceive it, Father appears to be arguing that, because he was allegedly unlawfully incarcerated at the time of the filing of the petition, this ground for termination is not applicable. This argument is unavailing. At the time of the final hearing, the Polk County charges were still pending. Father cites no law, nor have we found any, wherein the possibility of a not-guilty verdict at a later trial date would render his incarceration inapplicable for purposes of this ground for termination. Even if the initial reason for the issuance of the community corrections violation warrant based on the Polk County charges was unjustified, Father ultimately admitted that he violated his community corrections requirements. Indeed, Father stipulated that he materially violated the terms of his community corrections sentence by failing to report at the end of February 2014, the violation of which would also have led to Father's re-incarceration. Having determined that Father was incarcerated at the time of the filing of the termination petition and for some of the four months preceding the filing of the petition, we conclude that the ground for termination found in section 36-1-102(1)(A)(iv) is applicable in this case, rather than the alternative ground under section 36-1-102(1)(A)(i). The trial court, therefore, erred in applying the ground for termination contained in section 36-1-102(1)(A)(i), and, as a result, the trial court's finding with regard to this ground is, consequently, reversed.

Having determined that the definition of abandonment found in section 36-1-102(1)(A)(iv) is applicable in this case, we next proceed to consider whether Father willfully failed to visit the child in the time period at issue—that is, the four months

- 14 -

preceding his incarceration, or the time period between January 13, 2014, and May 12, 2014, the date just prior to Father's incarceration.

Here, the trial court found that Father attended only two supervised visits between January 1, 2014, and February 6, 2014. It is unclear from the record whether one, or both, visits even occurred during the relevant four month period between January 13, 2014, and May 12, 2014. Even giving Father the benefit of the doubt, however, it is undisputed that, at most, two visits occurred during the relevant four month period. According to the trial court, however, Father's efforts constituted only token visitation, at best. Moreover, the relevant time period included the period of time that Father was actively evading arrest. As such, the trial court found that the lack of visitation was willful because he "made a conscious and willful decision to evade arrest and thereby forfeit[ed] his supervised visits."

We must now address whether the visits that occurred during the relevant four-month period amounted only to token visitation. *See* Tenn. Code Ann. § 36-1-102(1)(C). The record does not preponderate against the trial court's finding that Father exercised visitation only twice in the relevant four-month period leading up to Father's incarceration. Here, it is undisputed that Father visited with the child twice at the supervision center between January 1, 2014, and February 6, 2014, for a few hours each. The record establishes that Father ceased visitation for approximately three out of the four months preceding his incarceration because he was evading arrest. We have repeatedly held that two visits in the span of four months constitute no more than token visitation. *See **In re Jamontez S.***, M2013-00796-COA-R3-PT, 2013 WL 5302503, at *5 (Tenn. Ct. App. Sept. 17, 2013) (concluding that the evidence supported the trial court's finding that "the two visits in the four months preceding the filing of the termination petition were token"); ***In re T.L.***, No. E2004-02615-COA-R3-PT, 2005 WL 2860202, at *10 (Tenn. Ct. App. Oct. 31, 2005) ("Certainly, two hour-long visits over four months constitute visitation 'of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[ren.]'"); *see also **In re Matthew T.***, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *12 (Tenn. Ct. App. Apr. 20, 2016) (concluding that father's three visits and mother's four visits in the relevant four-month period "were so infrequent and of such short duration that they represent token visitation" in light of the fact that "open visitation" was available). Accordingly, the evidence does not preponderate against the trial court's finding that Father's visitation during the relevant period was merely token.

Despite Father's contention otherwise, the evidence also preponderates in favor of the trial court's finding that Father's failure to engage in more than token visitation with the child was willful. A parent's failure to visit a child does not constitute a ground for termination unless the parent's failure to visit was willful. In ***In re Audrey S.***, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination of parental rights cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has . . . "willfully" failed to visit . . . the child for a period of four consecutive months . . . . In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing . . . .

\* \* \*

Failure to visit . . . a child is "willful" when a person is aware of his or her duty to visit . . . , has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654; *see also Shorter v. Reeves*, 72 Ark. App. 71, 32 S.W.3d 758, 760 (2000); *In re B.S.R.*, 965 S.W.2d 444, 449 (Mo. Ct. App. 1998); *In re Estate of Teaschenko*, 393 Pa. Super. 355, 574 A.2d 649, 652 (1990); *In re Adoption of C.C.T.*, 640 P.2d 73, 76 (Wyo. 1982). . . .
The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d at 863–64 (internal citations and footnotes omitted). "Whether a parent failed to visit . . . a child is a question of fact. Whether a parent's failure to visit . . . constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). As previously discussed, this Court reviews questions of law de novo with no presumption of correctness. *Id.*

With regard to this issue, the trial court specifically found that Father had the ability to visit with the child weekly but instead chose to forgo the visits in favor of evading arrest. Although Father blamed Mother for cancelling the last scheduled visit prior to his incarceration, Father admitted that he never requested more visitation. As such, it appears that Father was more concerned with evading arrest for nearly three months than visiting with the child. Indeed, Father admitted that his behavior had been a "personal choice" and that he had "made some bad decisions." Furthermore, although it

is undisputed that Father requested to speak on the telephone with the child while he was a fugitive, he admitted that he did not wish to visit with the child while a warrant for his arrest was active because of the possibility that he would be arrested in front of the child. This Court has stated that "telephone calls are not generally a substitute for in-person visitation for the purposes of determining whether a parent has willfully abandoned a child." *In re Kaiden T.*, No. M2014-00423-COA-R3-PT, 2014 WL 7149215, at *6 (Tenn. Ct. App. Dec. 15, 2014).[9] Father's attempt to reach out to the child through telephone calls after he ceased visitation because he was evading arrest is not enough to justify overturning the trial court's finding that Father willfully engaged in nothing more than token visitation during the relevant period.

Father further argues that the evidence at trial "clearly establish[es]" that Father "took conscious and repeated action to seek out not only his daily calls to [the child] but to also jump through all of [Mother's] needless hurdles to have his court[-]ordered supervised visits." As we perceive it, Father appears to be arguing that, because his efforts to effectuate the visitation were thwarted by an uncooperative Mother, his failure to visit the child was excused and therefore not willful. It is well-settled in Tennessee that a parent who attempts to visit and maintain a relationship with the child, but is "thwarted by the acts of others and circumstances beyond his control," cannot be found to have willfully abandoned the child. *In re Adoption of A.M.H.*, 215 S.W.3d at 810. Nevertheless, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d at 393 (citing *In re Audrey S.*, 182 S.W.3d at 864); *see also In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Conduct that amounts to a significant restraint of or interference with a parent's efforts to support or develop a relationship with a child includes . . . blocking access to the child[,] . . . keeping the child's whereabouts unknown[,] . . . or . . . vigorously resisting a parent's efforts to visit the child." *In re Audrey S.*, 182 S.W.3d at 864 n.34.

The time period that Father claims to have difficulty procuring visitation occurred in late 2013, well before visitation was re-established in January 2014. Even if visitation with the child was slow to resume subsequent to Father's release on community corrections in November 2013, it is undisputed that supervised visitation was successfully re-established during the relevant time period between January 13, 2014, and May 12, 2014. Although Mother's action of allowing Father only one visit per week in violation of an existing court order is not irreproachable, the record shows that Mother's arguably improper conduct did not wholly interfere with Father's ability to visit during the relevant

---

[9] Under circumstances not present in this case, telephone calls may be relevant in the determination of whether a parent willfully failed to visit the child when a parent must travel long distances in order to visit the child. *In re Kaiden T.*, 2014 WL 7149215, at *6. In this case, however, Father's distance was based on his poor decision to evade arrest rather than for any legitimate reason.

period. Instead, the record reflects that, after Father re-established visitation in January 2014, it was his own behavior that terminated his visitation during the relevant period; thus, Mother's arguably improper behavior prior to the four month period simply had no effect on Father's ability to visit during the period at issue in this case. Based on these circumstances, we affirm the trial court's conclusion that Father willfully failed to visit the child in the four months preceding Father's incarceration.

### 2. Abandonment by Wanton Disregard for the Welfare of the child

We next address whether sufficient evidence exists to support the trial court's finding of abandonment by an incarcerated parent based on wanton disregard pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv). This test focuses on whether (1) the parent is incarcerated at or near the time of the filing of the termination petition, and (2) whether the parent engaged in conduct prior to incarceration exhibiting a wanton disregard for the child's welfare. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) ("A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding , and . . . the parent . . . has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.").

This Court has explained:

Incarceration alone is not conclusive evidence of wanton conduct prior to incarceration. *In re Audrey S.*, 182 S.W.3d [at] 866 . . . . Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*

Numerous cases have held that a parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child. *See, e.g.*, *State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *State v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL

1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997). "[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68.

*In re C.A.H.*, No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009). We first note that the law in Tennessee is clear that the ground of wanton disregard need not require that the conduct at issue occur within the four month window prior to incarceration. *In re Audrey S.*, 182 S.W.3d at 865 ("This test has no analog to the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period."). Rather, Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero. *See In re A.B.*, No. E2016-00504-COA-R3-PT, 2017 WL 111291, at *10 (Tenn. Ct. App. Jan. 11, 2017) ("For a child in utero, we primarily have found wanton disregard where a parent, after learning of the pregnancy, commits the crime for which he or she is subsequently incarcerated."). *But see In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015) (concluding that father's actions that led to his incarceration did not constitute wanton disregard for the child's welfare because father did not know that mother was pregnant with his child). "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

The trial court found that "after [Father's] initial arrest on April 4, 2012, there were multiple other arrests and multiple other periods of incarceration." The trial court also found that Father has criminal convictions in "five . . . different felony cases, two . . . misdemeanor shoplifting cases, and is currently awaiting trial on another felony case." The trial court further found that Father "engaged in a persistent, pervasive, and continual course of criminal conduct" and was concerned "by the number of criminal charges which occurred and the time period in which the charges occurred." Although the trial court believed that Mother should have "refrained from telling the . . . child about [Father's] initial arrest," the trial court found that Father's subsequent conduct "likely made it impossible for [Mother] to avoid telling the . . . child about these arrests and periods of incarceration." The trial court credited the child's testimony, who, unsolicited, testified on two different occasions that Father took the child with him during the commission of the theft. Despite Father's explanation, the trial court discredited his testimony as "implausible."

In the present case, the evidence establishes that after Father's initial arrest on April 4, 2012, and subsequent conviction, Father continued to incur multiple criminal charges within a short period of time. Father eventually pleaded guilty to most of these charges, including stipulating that he violated his community corrections by failing to report at the end of February 2014.[10] Despite these convictions, Father was given another chance after his release on community corrections to forge a relationship with the child. Very shortly after visitation was re-established at the visitation center in January 2014, Father disappeared when a warrant for his arrest was issued. Thus, it appears to this Court that Father was more concerned with evading arrest than with exercising his visitation with the child.

Even more troubling is the fact that the child testified twice about an incident where Father took the child with him to commit a theft. The child also revealed during one of those proceedings that Father cautioned him to keep the incident a secret. Although Father disputes the circumstances of this incident, the trial court chose not to credit his testimony. As previously discussed, credibility determinations are accorded great deference by this Court absent clear and convincing proof otherwise. **Walton**, 950 S.W.2d at 959. The trial court is clearly entitled to credit the child's testimony over that of Father's, and no clear and convincing evidence to the contrary has been shown. Given Father's multiple theft convictions, his decision to expose the child to criminal activity, and Father's decision to evade law enforcement, we conclude that Father's conduct prior to his incarceration exhibited a wanton disregard for the welfare of the child. The trial court therefore did not err in finding that this ground was proven by clear and convincing evidence.

## B. Best Interest of the Child

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. **White v. Moody**, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. **In re Audrey S.**, 182 S.W.3d at 877. The focus shifts to the child's best interest. **Id.** Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. **Id.** However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d).

---

[10] Even if Father is contesting one later conviction in McMinn County and a more recent charge in Polk County, Father does not dispute his convictions for the other four felonies and two misdemeanors, to which he pled guilty purportedly as "best-interest guilty pleas to non-violent property offenses."

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). We have repeatedly held that "[t]he best interests of the child are to be determined from the perspective of the child rather than the parent." *In re L.M.W.*, 275 S.W.3d 843, 851 (Tenn. Ct. App. 2008) (citations omitted). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M. A. R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

The trial court made detailed and thorough findings with regard to its finding that it was in the best interests of the child for Father's rights to be terminated. The trial court found that the four years preceding the final hearing "during which [Father] ha[d] been incarcerated and/or engaged in criminal conduct have been very significant years in th[e] child's development." *See* Tenn. Code Ann. § 36-1-113(i)(3) (directing the trial court to consider "[w]hether the parent or guardian has maintained regular visitation or other contact with the child"); *Id.* § 36-1-113(i)(4) (directing the trial court to consider "[w]hether a meaningful relationship has otherwise been established between the parent or guardian and the child"). The evidence also does not preponderate against this finding, which weighs in favor of termination. Here, the record shows that, as of the date of the final hearing, Father was incarcerated with an unknown release date. Further, it appears that Father has little to no relationship with the child at all. Indeed, Father admitted that he had little involvement in the child's life during his periods of incarceration. Father had many opportunities after the June 1, 2014 hearing restricting him to supervised visitation, and again after his release on community corrections in November 2014, to forge a meaningful relationship with the child. However, he failed to do so voluntarily because he: (1) continued to engage in criminal activity; and (2) chose to disappear for nearly three months, with no further communications with the child except for a few phone calls in order to avoid being apprehended. As a result, Father was either incarcerated or evading arrest for much of the four years preceding the final hearing, allowing little assurance that his circumstances would improve. In contrast, the record indicates that the child has done well in Mother's and Stepfather's care. Despite Father's sporadic presence in the child's life, the child is well-rounded, continuing to make straight A's, participating in the gifted program at school, and exceling in three different sports.

In addition, the trial court "f[ound] it significant that the . . . child, unsolicited, testified that [Father] took the child with him during the commission of a theft." *See* Tenn. Code Ann. § 36-1-113(i)(7) (directing the trial court to consider "[w]hether there is criminal activity in the home . . . as may render the parent . . . consistently unable to care for the child in a safe and stable manner"). Here, the undisputed fact shows that Father did take property from a house that was boarded up in the presence of the child. We

concede, however, that besides this one incident, no other proof was provided establishing that Father ever exposed the child to any harm. However, as a result of this incident, the child believed that his Father was a criminal and did not want to be associated with Father. Father not only participated in criminal activity himself but also exposed the child to one of his criminal endeavors. Although Father attempted to explain this event, the trial court chose not to credit his testimony and no clear and convincing evidence exists to overturn the trial court's credibility determination. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.").

Furthermore, the trial court found that Appellees "have been the sole source of support for the . . . child since [Father's] initial arrest on April 4, 2012" and that the child "is well cared for in his current environment" in terms of "his health, welfare, safety, and stability." *See* Tenn. Code Ann. § 36-1-113(i)(9) (directing the trial court to consider "[w]hether the parent or guardian has paid child support"). This finding is likewise supported by the record and weighs in favor of termination. Our review of the record shows that, besides Father's initial gifts, Father did not contribute any further support to the child, especially in the last few years. On the other hand, Mother and Stepfather have stable jobs and have adequately provided for the child's needs without Father's help.

Moreover, the trial court found that, although the child stated his willingness to speak with Father on the phone, the child articulated that he neither wanted to see Father nor wanted Father to be his parent. According to this Court, "provided the trial court exercises due caution, 'it is permissible, indeed important, to give significant weight to the child's testimony' on his own best interests." *In re Taylor A.B.*, No. W2013-02312-COA-R3-PT, 2014 WL 3778749, at *7 (Tenn. Ct. App. July 31, 2014) (quoting *Maxwell v. Woodard*, No. M2011-02482-COA-R3-CV, 2013 WL 2420500, at * 18 (Tenn. Ct. App. May 31, 2013)). In order to guard against factors such as an adult pressuring a child into expressing a particular preference, "due caution is in order in considering the testimony of a child." *Maxwell*, 2013 WL 2420500, at * 18. We note that Father does not assert that Mother or Stepfather improperly influenced the child into expressing his desire to be adopted by Stepfather. Accordingly, the trial court did not err in considering the child's testimony and giving it appropriate weight. From our review of the record, the child's testimony heavily weighs in favor of termination. Here, the child testified that he did not want to be associated with a criminal, so he chose to have his last name changed to Stepfather's name at school. The child indicated that he has a "strong" relationship with Stepfather, with Stepfather coaching him in sports, attending his sporting events, and taking him on outdoor adventures. The child appears to have a very high opinion of Stepfather, using him as a role model for what he wants to be when he grows up. On the other hand, the child does not think highly of his Father; rather, he feels ashamed because he witnessed what he perceived to be Father stealing from someone's house. Although the child still loves Father, according to the child, Stepfather "parents" him better. As

such, the child stated his wish for Father's parental rights to be terminated so that Stepfather could adopt him.

Not all factors, however, weigh clearly in favor of termination. First, there is some doubt that the child's mental, emotional, or medical condition would suffer harm if the child was required to maintain contact with Father. *See* Tenn. Code Ann. § 36-1-113(i)(5). The record shows that the child is doing exceptionally well in Mother's and Stepfather's care. The child's mental and emotional health certainly cannot be attributed to Father, who has been incarcerated in recent years. Still, nothing in the record indicates that the child suffered any harm when visitation with Father was ongoing. Accordingly, this factor favors neither party in this case.

Furthermore, there is no evidence that Father or anyone in his home has ever "shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child" or any other child. Tenn. Code Ann. § 36-1-113(i)(6). Indeed, prior to Father's decision to engage in criminal activity, there is nothing in the record to suggest that the child was in any way abused or neglected in Father's care. Accordingly, this factor weighs against termination.

In addition, we note that Mother's behavior has certainly not been beyond reproach throughout the events at issue in this trial. Rather than attempting to shield the child from knowledge of Father's criminal activity, it appears that Mother hastily informed the child of Father's first arrest in April 2012. Although Mother explained at trial that the conversation was necessary because of the child's questions, it appears that the necessity was created when Mother prematurely picked the child up from school in contrast to the child's typical schedule. Still, we note that given Father's multiple arrests and convictions, as well as Father's decision to terminate visitation so that he could evade arrest, keeping the child ignorant of Father's criminal behavior was unlikely. Indeed, the evidence in the record shows that Father involved the child in such criminal activity on at least one occasion.

In addition, the record shows that Mother did at times attempt to thwart Father's attempts at visitation and telephone contact, albeit prior to the four month period at issue, as discussed *supra*. Accordingly, some of the lack of meaningful relationship in this case can be attributed to Mother's efforts to limit the child's contact with Father. Despite the existence of the June 1, 2012 order that was still in effect allowing Father at least two supervised visits per week, it appears that Mother unilaterally allowed Father to visit with the child only once per week at most. We note, however, that Mother's attempts to limit visitation appear to stem from reasonable fears regarding Father's criminal activity and Mother eventually allowed visitation to resume once a suitable visitation supervisor was established. Visitation was terminated for the last time not by any action on Mother's part, but by Father's decision to evade arrest.

We do not doubt that Father loves the child at issue in this case. However, Father made the voluntary decision to engage in criminal activity, knowing that such activity could remove him from the child's life. Even when Father received a second chance, he almost immediately was arrested on new charges and admittedly violated the terms of his community corrections supervision, again removing him from the child's life. Because of Father's decision, he and the child have little to no meaningful relationship. Instead, Stepfather has stepped into the role of parent for the child and appears to be doing an admirable job. The best interests of the child are therefore furthered by allowing the child to remain in the nurturing, stable home of Mother and Stepfather and to move on from the stigma and instability that results from his relationship with Father. From the totality of the circumstances, we conclude that clear and convincing evidence supports the trial court's conclusion that termination of Father's parental rights is in the child's best interest.

CONCLUSION

Based on the forgoing, the judgment of the Blount County Circuit Court is reversed with respect to its finding of abandonment by willful failure to visit as defined by Tennessee Code Annotated section 36-1-102(1)(A)(i) but affirmed in all other respects. Costs of this appeal are taxed to Appellant, Mark R., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE